## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MORGAN COHEN, et al, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF CHESTER, et al., | : | |
| Defendants. | : | No. 15-5285 |

### MEMORANDUM OPINION

Timothy R. Rice                                          August 20, 2021
U.S. Magistrate Judge

**Introduction**

Following a partial settlement agreement, I must resolve only two issues: (1) whether Madison Cohen, whose psychiatrist described as suffering "almost unimaginabl[y]" severe psychological and intellectual disabilities, has been denied benefits under a federal aid program administered by the Commonwealth of Pennsylvania through the County of Chester (the "County"); and (2) if so, the amount of compensatory damages. See Partial Settlement Agreement (doc. 86) at ¶ 5.

Ms. Cohen, through her parents, alleges that Defendants' benefit denials caused a chronic lack of care for her basic living needs along with the loss of critical therapeutic services to improve the quality of her life, which features decades of self-destructive behavior, property damage, and physical violence to bystanders, caregivers, and family members. No government official ever issued a formal "denial" of Ms. Cohen's request for services, and Ms. Cohen is one of the top recipients of government assistance for developmentally disabled citizens in the Commonwealth. Nevertheless, she contends that County officials stymied her repeated attempts to secure the full panoply of eligible services that she desperately needed for nearly ten years, resulting in nearly $10 million in lost benefits.

I reject Ms. Cohen's claims against the Commonwealth and the bulk of her claims against the County as either unfounded or disallowed under the relevant government program. I find, however, by a preponderance of the evidence that the County denied Ms. Cohen some services by failing at times to effectively and timely deliver to her all available benefits. Although the Commonwealth coordinated with the County in delivering benefits under the Waiver, the County was responsible for dealing directly with Ms. Cohen and her family. In that role, I find that the County was deliberately indifferent to some of Ms. Cohen's need for benefits, and that Commonwealth officials were not liable.

The County denied Ms. Cohen services by failing to timely resolve or remove administrative, bureaucratic, and technical obstacles that prevented Ms. Cohen from achieving the maximum benefit of a government aid program designed to assist our nation's most vulnerable citizens. On those occasions, the County violated its obligations under the aid program to locate, identify, and monitor the delivery of essential services to Ms. Cohen, resulting in a denial of speech therapy and respite care. See Service Definitions Narrative for the Consolidated Waiver, P-2 at 42.

Compensatory damages are available under § 504 of the Rehabilitation Act when a defendant demonstrates "deliberate indifference" to a claimant. D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014). Despite repeated pleas for assistance from Ms. Cohen's parents, County officials were steadfast in their refusal to address some impediments that denied Ms. Cohen benefits. Bridget Thrash, the County's deputy administrator for Intellectual Disabilities Services responsible for the County's response to Ms. Cohen between 2009-19, acknowledged that at one point she was unaware of the magnitude of Ms. Cohen's capacity for physical harm and property destruction. Her justifications and attempted explanations for her

failings were incredible.  And in other instances, a mere referral of service provider names by County officials would have broken a bureaucratic logjam over potential insurance coverage issues that prevented Ms. Cohen from receiving essential therapy.  Although generally well-motivated, County officials at times elevated process over substance to Ms. Cohen's detriment and were deliberately indifferent to some of her needs.  To the extent Defendants' witnesses testified inconsistently with my findings, I reject the testimony as incredible based on the other conflicting evidence.

Only a small portion of refused services were denied with "deliberate indifference," and I award Ms. Cohen damages for her pain, suffering and loss of enjoyment of life relating to those denials.  Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 437 n.11 (2001) ("pain and suffering are generally available as species of compensatory damages"); Richardson v. Knud Hansen Mem'l Hosp., 744 F.2d 1007, 1013 (3d Cir. 1984) ("damages for pain and suffering are considered 'compensatory'").  Such damages, of course, cannot be computed with mathematical precision but must be fair, just, and reasonable.  See Waldorf v. Shuta, 916 F. Supp. 423, 428 (D. N.J. 1996) ("extremely great leeway must be granted to the trial fact-finder, who has been afforded the best opportunity to observe first-hand the evidence showing plaintiff's anguish and agony") (citing Bernard v. State, 563 So.2d 282, 287 (La. App. 1990)).  Consistent with those legal principles, I award $200,000 in damages for Ms. Cohen's pain, suffering, and loss of enjoyment of life.

**Findings of Fact**

      I.     Ms. Cohen's Condition and the Consolidated Waiver Program

1.     Ms. Cohen, a 28-year-old County resident, has autism, intellectual disabilities, post-traumatic stress disorder, apraxia and sensory integration difficulties, and bipolar disorder, resulting in severe functional limitations and violent behavior.  N.T. 4/8/21 at 97, 128-31.

2.      Throughout her life, Ms. Cohen has banged her head through walls, stapled herself, punched and kicked others, jumped from moving cars, and engaged in other instances of unpredictable and violent behavior toward herself, her family, and others.  Id. at 54-56,

3.     Ms. Cohen qualifies for the County's Consolidated Waiver Program (the "Waiver").  N.T. 4/9/21 at 146.  The Waiver provides therapeutic and rehabilitative services to individuals eligible for services in an Intermediate Care Facility but through home and community-based services.  42 U.S.C. § 1396n(c).

4.     The County's Administrative Entity ("AE") administers the home and community-based services provided under the Waiver for Ms. Cohen.  N.T. 4/19/21 at 131-32; AE Agreement, P-18.

5.     The County's functions include enrolling people in the Waiver, reviewing and authorizing plans, and monitoring providers.  N.T. 4/9/21 at 101; P-18 at 17.

6.     The County also has an in-house Supports Coordination Organization ("SCO") for Waiver participants.  N.T. 4/9/21 at 146.

7.     The Cohens selected the County's SCO as their support coordination organization.  Id.

8.     The SCO's support coordinators assist Waiver participants in locating, coordinating, and monitoring services.  Id. at 102.  They also develop Individual Service Plans ("ISPs") and Behavioral Support Plans ("BSPs").  Id.; 7/1/17 Waiver Renewal, D-20 at 123.  These

documents assess a Waiver participant's needed services and ensures they are provided.  ISP Manual, P-1 at 11; N.T. 4/8/21 at 62.  Support coordinators visit Ms. Cohen to monitor her services and identify service needs.  D-20 at 123.  Those visits are documented in monitoring reports.  See SCO Monitoring Reports, P-10.

9.      The AE is responsible for reviewing documents to determine Waiver eligibility.  N.T. 4/19/21 at 132-33.  The AE uses service notes, progress notes, data, and behavioral tracking to implement its strategies.  Id.  It may not override a regulation of the Waiver.  Id. at 149.

10.     The Waiver provides habilitation services, behavioral support services, respite, mileage reimbursement, occupational therapy, speech therapy, and music therapy.  N.T. 4/9/21 at 100-101; D-23 at 8, 118, 154, 176, 187, 262.

11.     The Waiver does not provide therapy services for individuals under 21.  N.T. 4/9/21 at 124; D-23 at 155.

12.     The Waiver does not cover services when another party, including an insurance company, is responsible for payment and provision of the service.  N.T. 4/9/21 at 149-50; 10/1/19 Waiver Renewal, D-23 at 155.

13.     The Waiver compensates individuals for therapies only if an insurance company denies the service.  N.T. 4/9/21 at 125; D-23 at 155.

14.     The Waiver did not provide music therapy until 2017.  N.T. 4/9/21 at 125.

15.     The highest support staffing ratio provided by the Waiver is 2-to-1.  Id. at 159; D-23 at 93.

16.     In 2009, Ms. Cohen enrolled for services under the Waiver's Participant-Direct Option, N.T. 4/9/21 at 7, 146, 159, allowing her parents, Jayson and Michelle Cohen, and Mr. Cohen's cousin, Jonathan Katz, to serve as the Common Law Employer ("CLE") for Ms. Cohen's service

providers.  Id. at 7, 159.  The CLE manages the workers who provide the Waiver's services and

is responsible for hiring, training, scheduling, and paying the habilitation workers.[1]  Id. at 6.

17.     The Cohens elected a self-directed service model, which allowed them to select their

services and make decisions over Ms. Cohen's service providers.  N.T. 4/8/21 at 84-85; 10/1/19

Waiver Application, D-23.

        II.     Ms. Cohen's Claims.

18.     Ms. Cohen brings claims under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

Sec. 794, et sq., and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. 12131.

See Compl. (doc. 1).  Because both statutes have a two-year statute of limitations, and the

Complaint was filed on September 22, 2015, Ms. Cohen's claims can only originate after

September 22, 2013.  See 42 Pa. C.S. § 5524 (two-year statute of limitations for personal injury

claims in Pennsylvania); see also Disabled in Action of Pennsylvania v. Southeastern

Pennsylvania Transp. Authority, 539 F.3d 199, 208 (3d Cir. 2008) ("the statute of limitations

applicable to claims under Title II of the ADA and Section 504 . . . is the statute of limitations

for personal injury actions in the state in which the trial court sits").

19.     Ms. Cohen claims the County denied her home and community habilitation; enhanced

habilitation; behavioral support; speech, language, and occupational therapy; respite;

transportation reimbursement; and music therapy.  See Pl. Prop. F.F. and Concls. Of Law. (doc.

112).

20.     The Cohens request compensatory damages under Section 504.  Id. at ¶56.

---

[1]      Michelle Cohen stopped serving as a CLE after she was convicted for fraud relating to
her daughter's participation under the Waiver.  N.T. 4/9/21 at 7.

21.     I find the Cohens' witnesses, especially Jayson Cohen, were credible in testifying that Ms. Cohen was blocked from speech therapy and respite.

22.     I find most of the Defendants' witnesses also were credible.  However, at times, the County witnesses' testimony corroborated the Cohens' claims that a bureaucratic quagmire denied Ms. Cohen access to certain Waiver services.  N.T. 4/9/21 at 208 (support coordinator referred three speech therapy providers covered by the Cohens' insurer, but two did not provide in-home service and one required Ms. Cohen to be homebound), 215-17 (support coordinator agreed Ms. Cohen did not receive services outlined in her ISP when behavioral support staffing was not provided, and she addressed the issue by taking it to the AE), 218 (the behavioral support providers did not take corrective action for two years despite knowing services were not being provided).

23.     The Cohens' witnesses were more credible than Ms. Thrash, the former County Administrator who, after knowing Ms. Cohen for at least four years, claims she somehow lacked "the clarity of assessment of the severity of her behaviors" when questioning the Cohens' request for overnight 2-to-1 support in 2011.  Id. at 171-73, 175-77, 183-84; Thrash Email, P-22; Thrash Email, P-23.  Ms. Thrash's testimony was defensive, guarded, and generally not candid, and I discredit parts of her testimony as biased and designed to protect her self-interest.  For example, her claimed inability to effectively assess Ms. Cohen's condition in 2011 is astonishing given the undisputed record establishing the breadth of Ms. Cohen's lifetime of severe functional limitations and violent behavior.

a.     Home and Community Habilitation

24.     Home and community habilitation consists of "support in the general areas of self-care, communication, fine and gross motor skills, mobility, personal adjustment, relationship development, socialization, and use of community resources."  7/22/15 Waiver, D-16 at 83.

25.     From September 22, 2013 to 2016, Ms. Cohen's ISPs stated she needed 24/7 support from three or four adults.  ISP, P-19 at 96, 101, 105, 114, 125.

26.     The July 14, 2017 SCO monitoring recorded the Cohens' request for "enhanced in home and community supports, [with] a 'lead' [social worker] with credentials."  P-10 at 5.  The monitoring also stated that Ms. Cohen received all services and supports from her ISP, including 2:1 in-home and community supports, behavior supports, transportation mileage reimbursement, overnight respite, and temporary respite.  Id.

27.     Although the Cohens requested 4:1 staffing, it was not permitted under the Waiver.  See supra at ¶ 15.  The County, however, added extra hours of behavior support.  N.T. 4/9/21 at 154-55.

b.     Enhanced Habilitation

28.     Enhanced habilitation consists of 2:1 habilitation support with staff who have at least a four-year degree.  D-16 at 84.

29.     The County first offered enhanced habilitation to Ms. Cohen on October 24, 2017, after the behavior support provider said it would be helpful because new behavior support services' ("BSS") aides struggled to understand Ms. Cohen's BSP, and the Waiver modified enhanced habilitation to require only one staffer with greater education credentials.  N.T. 4/19/21 at 23-25.

30.     Before 2017, the Cohens had never sought enhanced habilitation.  N.T. 4/8/21 at 75.

31.     The SCO coordinator tasked with identifying services that a Waiver participant needs credibly testified that she and her colleagues did not identify enhanced habilitation as a service Ms. Cohen needed until 2017 because there had previously been no issues with the quality of habilitation services.  N.T. 4/19/21 at 26.  Starting in 2017, there were problems of BSS aides not comprehending Ms. Cohen's BSPs, necessitating the implementation of enhanced habilitation services.  Id. at 23-25.

32.     Since 2017, Ms. Cohen has received 2:1 enhanced habilitation for 12 hours per day.  N.T. 4/8/21 at 62, 68-69.

c.     Behavior Support

33.     BSS include "functional assessment; the development of strategies to support the participation based upon assessment; and the provision of interventions and training to participants, staff, parents and caregivers."  D-16 at 134.

34.     Ms. Cohen currently receives 48 hours of BSS per week from a BSS provider.  N.T. 4/8/21 at 182.

35.     The Waiver, as a provider of last resort, did not provide BSS to Ms. Cohen when she was in school because she already received the support as a State Plan service.  Id. at 183.

36.     In 2015, the Waiver authorized 48 hours of BSS per week after the Cohens found a BSS aide from Kaleidoscope—a BSS agency—willing to work 40 hours.  Id. at 85.  When the aide left Kaleidoscope, it could not fill the authorized hours and discharged Ms. Cohen from its services.  Id. at 196.

37.     The County then engaged EPIC to provide BSS to Ms. Cohen.  Id. at 190-92.

38.     EPIC fully staffed Ms. Cohen's BSS for only two months between July 14, 2017 to September 25, 2019.  P-10 at 3, 5, 18, 31, 43, 57, 68, 93, 113, 122, 131, 134, 143, 151, 156, 160, 168, 174.

39.     During the July 14, 2017 SCO monitoring, the Cohens sought 45 hours of BSS per week, a demand that EPIC could not meet.  Id. at 7.  Ms. Cohen was also "still in need of new speech and occupational therapists.  EPIC [was] not able to provide those services."  Id.

40.     In the July 14, 2017 SCO monitoring, the Cohens "expressed concerns over several [BSS aides] recently hired through EPIC."  Id. at 5; see also N.T. 4/8/21 at 191-93 (detailing misconduct by BSS aides).  One concern involved professionalism of the staff as well as their ability to follow the BSP.  P-10 at 5.  One BSS aide was discharged following a formal complaint by Jayson Cohen, and the support coordinator noted that "EPIC is working to resolve getting appropriate staff on board."  Id.

41.     In an August 21, 2017 SCO monitoring, EPIC was unable to fill all the BSS support hours in Ms. Cohen's ISP and advised the Cohens to have the SCO refer Ms. Cohen to other behavior support providers.  Id. at 12.  Mr. Cohen refused to seek other referrals and instead demanded that EPIC fulfill its commitment to staff Ms. Cohen's BSS.  Id.; see also N.T. 4/19/21 at 29 (for several months, the Cohens refused to give the County consent to provide Ms. Cohen's information to other providers).  Mr. Cohen then advertised a position for BSS, and EPIC maintained they were actively recruiting for the position.  P-10 at 14, 16.  Mr. Cohen continued to reject EPIC's proposal of referring Ms. Cohen to another agency for BSS.  Id. at 16; see also N.T. 4/19/21 at 29.

42.     In a September 11, 2017 SCO monitoring, EPIC continued trying to provide Ms. Cohen with 45 hours of BSS per week.  P-10 at 20.  However, two aides still needed safety training.  Id.

One aide also informed the Cohens she was reducing her hours in November.  Id. at 22.  The

Cohens continued to reject EPIC's proposal to find supplemental referral services because it

could not meet Ms. Cohen's BSS hours.  Id. at 24; see also N.T. 4/19/21 at 29.

43.     In an October 23, 2017 SCO monitoring, EPIC continued searching for BSS aides and

referred two to the Cohens.  P-10 at 31, 33.  The support coordinator also offered the Cohens

potential staffers from a different referral agency, but Jayson Cohen wanted to see what EPIC

could provide before considering the referrals.  Id.; see also N.T. 4/19/21 at 29.

44.     In the October 23, 2017 SCO monitoring, EPIC lacked staffing to provide Ms. Cohen for

27 of the 195 hours required by her ISP.  P-10 at 33; D-116 at 37.  The SCO informed the

Cohens of their right to choose a different provider, but the Cohens chose to continue working

with EPIC.  P-10 at 33; D-116 at 37; see also N.T. 4/19/21 at 29.

45.     In the November 11, 2017 SCO monitoring, EPIC continued working to fill all behavior

support hours in Ms. Cohen's ISP.  P-10 at 43.  The Cohens also continued to reject the idea of

seeking another provider.  Id.; see also N.T. 4/19/21 at 29.  EPIC attempted to discharge Ms.

Cohen, but would not do so "if the issues surrounding restrictive procedures could be worked

out."  P-10 at 43.  EPIC hired a new BSS aide and was seeking another staffer to fill 45 hours.

Id. at 45-46.

46.     In 2017-18, due to BSS aides not showing up to work, EPIC provided only 1,200 of

2,496 hours of BSS owed to Ms. Cohen under the Waiver.  N.T. 4/8/21 at 197.

47.     ISPs include a backup plan to provide service when a provider agency, such as EPIC,

does not provide its committed number of staff.  N.T. 4/9/21 at 163.  The Cohens at various

times served as her backup service providers on the paid roster.  Id.

48.    When the support coordinator noticed EPIC's staffing issues, she responded by informing

the AE.  N.T. 4/9/21 at 215.

          d.      Speech and Occupational Therapy

49.    Speech and occupational therapy are available under the Waiver to persons 21 and older

who are in a community-integrated setting, and not institutionalized.  D-23 at 155.

50.    Those services also "may only be funded for adult participants [of the Waiver] if

documentation is secured by the support coordinator that shows the service is medically

necessary and either not covered by the participant's insurance or insurance limitations have

been reached."  Id.

51.    From 2015-2016, Allegretto Services provided speech therapy to Ms. Cohen under the

state Medical Assistance plan.  Id. at 190; P-19 at 122.

52.    After the Allegretto therapy stopped, Ms. Cohen's treating psychiatrist, Dr. Naser,

prescribed speech therapy and submitted it to the support coordinator.  N.T. 4/9/21 at 189.  The

support coordinator identified speech therapy providers who would accept the Cohens'

insurance, but refused to identify a list of all potential providers covered under the Waiver,

insisting that the Cohens first exhaust their insurance coverage.  Id. at 192.

53.    The Cohens did not want to discuss potential therapies through their insurance to avoid

paying their policy's $4,000 deductible.  Id. at 187.

54.    In the August 21, 2017 SCO monitoring, Ms. Cohen needed speech and occupational

therapy services that were available through her insurance, but a provider had not been located.

P-10 at 16; see also N.T. 4/9/21 at 186-87 (support coordinators attempted to determine if the

Cohens' insurance covered occupational and speech therapies for the Cohens).  Although Jayson

Cohen wanted EPIC to staff those therapies, EPIC did not offer those services to adults such as Ms. Cohen.  P-10 at 16.

55.     In the December 18, 2017 SCO monitoring, the SCO Director recommended Bayada as a possible speech therapy provider.  Id. at 63.

56.     The Cohens ultimately rejected Bayada because Ms. Cohen was not "homebound," a prerequisite to Ms. Cohen qualifying for Bayada's at-home therapy.  N.T. 4/9/21 at 194-95.  The Cohens reasonably refused to make a false representation concerning Ms. Cohen's "homebound" status to obtain services from Bayada.  Although the support coordinator explained that the Cohen's insurance company, not the Cohens, would determine whether Ms. Cohen is "homebound," the Cohens reasonably refused to pursue Bayada, especially given Michelle Cohen's prior criminal conviction.  Id. at 195.

57.     On January 24, 2018, the SCO Director suggested that the Cohens contact Bayada and obtain a case manager through Ms. Cohen's insurer to find occupational and speech therapy.  P-10 at 69.  However, the Cohens were justifiably frustrated by the ongoing stalemate about speech therapy and no longer willing to discuss it.  Id.; N.T. 4/9/21 at 195-96.  The Cohens stated there were no speech therapy providers in Chester County and ended the meeting with the SCO Director.  P-10 at 69.

58.     During the May 14, 2018 SCO monitoring, the support coordinator supervisor e-mailed the Cohens to ask if she could contact their insurer regarding the speech and occupational therapies.  P-10 at 89.

59.     During the July 18, 2018 SCO monitoring, Ms. Cohen continued to need speech and occupational therapy.  Id. at 100.  The Cohens again requested those services through the

Waiver, and the support coordinator again stated she first needed proof of insurance denial of those services.  Id. at 105-06.

60.     During the September 27, 2018 SCO monitoring, the wrangling over identifying an eligible therapy provider continued.  The support coordinator maintained that the Waiver could not cover therapies without an insurance denial.  Id. at 111.

61.     Nevertheless, the County steadfastly refused to provide the Cohens the name of an occupational therapy provider through the Waiver.  N.T. 4/8/21 at 214.

62.     In March 2019, the Cohens informed the support coordinator that their private insurance covered therapies, but with high co-pays.  P-10 at 147-48.  The Cohens asked if the Waiver could cover those co-pays, and were told it does not.  N.T. 4/9/21 at 195-96.

63.     In May 2020, the SCO Director again unreasonably insisted that the Cohens contact Bayada, even though Ms. Cohen is not "homebound."  Id. at 218.

         e.     Respite Care ("Respite")

64.     Starting in December 2013, after the Cohens prevailed in a hotly contested administrative hearing,[2] the Waiver provided thirty days per year of respite to the Cohens.  N.T. 4/8/21 at 202; P-47.  Respite is designed to provide family care givers with relief from providing 24-hour care. D-23 at 118.  Respite remained in the Waiver from 2015 until 2017, when the Waiver precluded respite for individuals who receive 24/7 support.  N.T. 4/9/21 at 151-54.

---

[2]     On November 13, 2013, the Cohens challenged the County's denial of respite before an Administrative Law Judge ("ALJ") at the Commonwealth of Pennsylvania Department of Public Welfare Bureau of Hearings and Appeals.  12/6/2013 Fair Hearing Order, P-47 at 3.  The ALJ determined Ms. Cohen was entitled to respite under the Waiver, id. at 8, and the County did not appeal the decision, N.T. 4/9/21 at 151.  I find that the adverse ALJ ruling partially motivated the deliberate indifference of County officials to Ms. Cohen's need for full respite services.  See N.T. 4/9/21 at 133-35 (detailing the County's opposition to Ms. Cohen in three different ALJ hearings).

65.    Despite prevailing at the administrative hearing, the Cohens were unable to fully use respite due to the Commonwealth's Fiscal Management Service's ("FMS") payment barriers, N.T. 4/8/21 at 208 (ODP limited workers' hours to 40 per week), and did not receive full cooperation from the County in attempting to redress those issues, N.T. 4/9/21 at 153-54.

66.    From 2014-16, the FMS contractor utilized another Medicaid program's software system and tried to apply it to the Waiver without making any necessary modifications.  N.T. 4/9/21 at 62.  The software program was incapable of performing the services required by the Waiver.  Id.

67.    That program, due to both software and human errors, repeatedly billed the Cohens inaccurately, erroneously found they were "running out of services" and rejected time sheets "for insufficient funds."  See id. at 63 (FMS software did not process Ms. Cohen's claims, requiring the Cohens to fax claims which were lost; DHS's contractor erroneously edited time sheet codes and hours worked), 65 (FMS misapplied waiver billing codes for 2:1 service, doubling expenses from Ms. Cohen's budget and overlapping times), 65 (DHS's contractor refused to pay for shifts that went past midnight, functionally blocking overnight respite).

68.    The 2014-2016 FMS contractor "routinely" changed accurate time sheets that had been submitted because its system was incapable of processing accurately recorded timesheets from service providers.  Id. at 67.

69.    Such bureaucratic obstacles denied the Cohens the full scope of eligible respite benefits. The problems could have been remedied by the County, which was responsible for its contractor's performance.  See id. at 68 (the problems with the FMS were "never . . . fixed").

70.    Ms. Thrash corroborated that the County knew of problems with respite payment, but inexplicably claimed she did not know whether they impacted the provision of full services to Ms. Cohen.  Id. at 154.  Her testimony on the latter point is incredible and defies logic and

common sense.  The County could have, and should have, remedied the problem, especially

given Ms. Thrash's awareness of the breadth of Ms. Cohen's issues, and her high-ranking

position in the County.

                f.      Music Therapy

71.      Music therapy was not available under the Waiver until 2017.  D-19-23.

72.      On October 23, 2017, the Cohens requested music therapy through the Waiver.  P-10 at

37.

73.      In the November 11, 2017 SCO monitoring, the Cohens reiterated their request for music

therapy, but the support coordinator and SCO Director could not find a provider in the five-

county Philadelphia area.  Id. at 49.

74.      In the December 18, 2017 SCO monitoring, the Cohens stated they would contact Bayada

about occupational and music therapy.  Id. at 63.

75.      During the May 14, 2018 SCO monitoring, the support coordinator supervisor e-mailed

the Cohens a website for music therapy and asked if she could send a referral.  Id. at 89

76.      The Cohens asked about music therapy during the January 24, 2018 SCO monitoring.  Id.

at 76.  The support coordinator sent the Cohens a list of music therapy associates under the

Waiver.  Id. at 93-94.

77.      In the September 27, 2018 SCO monitoring, the support coordinator supervisor also

informed the Cohens that music therapy could not overlap with behavior support.  Id. at 111.

78.      During the January 22, 2019 SCO monitoring, upon Mr. Cohen's request, the support

coordinator stated she would resend the list of music therapy associates.  Id. at 137.

79.      In the March 11, 2019 SCO monitoring, the County noted that Mr. Cohen sent an email

explaining his insurance covered music therapy but required a copay.  Id. at 147-48.

80.     The Cohens were required to demonstrate music therapy was not available under their insurance plan before seeking coverage under the Waiver.

81.     The Cohens failed to provide proof that Ms. Cohen's insurance would not cover the music therapy.

> g.     Mileage Reimbursements

82.     Under the Waiver, the Cohens are eligible for reimbursement of transportation mileage. N.T. 4/9/21 at 160.

83.     The Cohens never requested mileage reimbursements.  Id. at 3.

84.     Mr. Cohen did not file for mileage reimbursement because he feared recording mileage incorrectly and subjecting himself to prosecution, which had happened to his wife in another context, and because he did not know how to file for reimbursement.  Id. at 3-4.

85.     The support coordination staff told Jayson Cohen he could file for mileage reimbursement, and that as CLE of a self-directed model, Jonathan Katz "would be responsible for submitting those logs to the vendor fiscal agent."  Id. at 203.

86.     The forms for mileage reimbursement are accessible through the payment agent website. Id. at 160.

**Conclusions of Law**

87.     Ms. Cohen's claims originate after September 22, 2013.  Supra at ¶ 18.

88.     Pursuant to the Stipulation of Partial Settlement, the only issues to adjudicate are whether Ms. Cohen was denied a service under the Waiver, and any remedy.  See Partial Settlement Agreement ¶ 5(a) (I will address only limited claims for compensatory damages by determining whether "Cohen was denied any needed services allowable" under the Waiver program).

89.     Section 504 of the Rehabilitation Act provides "no otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

90.     Title II of the Americans with Disabilities Act ("ADA") provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12131.

91.     Regulations for the ADA and § 504 of the Rehabilitation Act prohibit recipients of federal funds from "directly or through contractual or other arrangements, utilize[ing] criteria or methods of administration . . . that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons."  28 C.F.R. §§ 35.130(3)(ii), 41.51(b)(3)(ii).

92.     Compensatory damages are available under § 504 of the Rehabilitation Act if a defendant demonstrated "deliberate indifference" to Ms. Cohen's request for benefits.  D.E., 765 F.3d at 269.  The "deliberate indifference" standard requires a plaintiff to present "evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge."  Id. (quoting S.H. v. Lower Merion Sch. Dist., 729 F.3d 248, 265 (3d Cir. 2013)).

93.     Compensatory damages include damages for pain, suffering, and loss of enjoyment of life.  Cooper Indus., Inc., 532 U.S. at 437, n.11; Richardson, 744 F.2d at 1013.

94.     I may award damages for Ms. Cohen's pain, suffering, and loss enjoyment of life. Cooper Indus., Inc., 532 U.S. at 437, n.11.; see also Maylie v. National R.R. Passenger Corp.,

791 F. Supp. 477, 482 (E.D. Pa. 1992); N.T. 4/8/21 at 16 (Commonwealth stating "pain and suffering could be [awarded] if [plaintiffs] have been able to prove that or if [Ms. Cohen] suffered any kind of direct harm as a result of these denial[s] of services"), at 17 (County adopting the Commonwealth's interpretation of potential damages).

95.     The County violated its obligations under the Waiver to locate, identify, and monitor the delivery of essential services to Ms. Cohen, resulting in a denial of speech therapy and respite care.  P-2 at 42.

96.     Ms. Cohen was not denied access to habilitation services.  She has received those services at the Waiver's maximum staffing ratio since before 2013.  Supra at ¶¶ 25-27.  Any request for increased staffing would constitute a substantial change to the Waiver, which is not a reasonable accommodation.  Alexander v. Choate, 469 U.S. 187, 300 (1985).

97.     Ms. Cohen was not denied access to enhanced habilitation services because the County immediately began providing it in 2017 when the County and the Cohens identified the need for the service.  Supra at ¶¶ 29, 31.  Before 2017, there was no need for enhanced habilitation because there were no issues regarding the skills and knowledge of Ms. Cohen's habilitation service providers.[3]  N.T. 4/19/21 at 26.  Enhanced habilitation did not become necessary until 2017, when EPIC informed the SCO that its non-college educated BSS aides were struggling to interpret Ms. Cohen's BSP.  Id. at 24-25.

98.     Ms. Cohen was not denied access to BSS.  When EPIC could not fulfill its staffing to Ms. Cohen, EPIC and the County encouraged the Cohens to seek new providers, which the Cohens

---

[3]     Some issues with habilitation services existed before 2017, but were not related to the quality of care provided to Ms. Cohen.  See N.T. 4/19/21 at 26 (testimony from Alison McVickar, director of Chester County's support coordination since 2014, that "any dissatisfaction may have been a specific staff person who maybe disrespected their home, but nothing in their work with Morgan").

refused.  Supra at ¶¶ 41-45.  Although EPIC first told the Cohens it would struggle to staff Ms.

Cohen, Jayson Cohen—not the County—decided to keep EPIC as Ms. Cohen's provider.

99.     The County denied Ms. Cohen meaningful access to speech therapy by refusing to

provide names of the Waiver's speech therapy providers and insisting on Bayada as a speech

therapy resource despite it requiring recipients to be "homebound," which Ms. Cohen was not,

supra at ¶¶ 56-57, 63.  See Alexander, 469 U.S. at 301 (requiring a governmental benefit grantee

to provide meaningful access of its services to an "otherwise qualified handicapped individual");

see also Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 685 (S.D.N.Y. 1996), aff'd 126 F.3d

372 (2d Cir. 1997) (benefits provider must take "modest affirmative steps" to ensure that access

to the benefits is meaningful).

100.    The County was deliberately indifferent to Ms. Cohen's need for speech therapy by

solely providing Bayada as a resource when it knew that Ms. Cohen did not qualify for Bayada's

therapy.  By insisting that the Cohens engage Bayada as a therapy provider in December 2017,

January 2018, and May 2020, supra at ¶¶ 56-57, 63, the County denied Ms. Cohen speech

therapy and inflicted pain, suffering, and loss of enjoyment of life for which I award Ms. Cohen

damages of $50,000.  With full access to that essential service, Ms. Cohen would have benefited

developmentally and been personally enriched by a more positive and vibrant life experience.

101.    The County also denied the Cohens access to respite from 2013 until it was removed

from the Waiver in 2017 by failing to address the bureaucratic and other deficiencies in the

timekeeping system, which resulted in a denial of the full scope of available respite benefits.

Supra at ¶¶ 65-70 (describing the problems with the FMS's software and employees, who

repeatedly received accurate timesheets, changed them, and processed them inaccurately).

102.     The County knew FMS's software could not accurately process Ms. Cohen's claims,

violating her right to respite under the Waiver, and it failed to resolve the issue.  Such inaction

demonstrated "deliberate indifference" to Ms. Cohen.  Supra at ¶¶ 69-70; see D.E., 765 F.3d at

269; see e.g., Steimel v. Wernert, 823 F.3d 902, 916 (7th Cir. 2016) ("The state . . .  cannot avoid

the integration mandate by binding its hands in its own red tape.").

103.     I award damages of $150,000 to Ms. Cohen for the pain, suffering, and loss of enjoyment

of life caused by the County's refusal to remove barriers to the effective delivery of respite.

Such inexplicable conduct frustrated Jonathan Katz's efforts to obtain respite for Ms. Cohen.  It

also impaired the Cohens' effectiveness in caring for Ms. Cohen by not providing them with

mental and physical breaks from the extraordinary demands related to Ms. Cohen's round-the-

clock care.  Those factors all diminished Ms. Cohen's ability to enjoy life because she did not

benefit from mentally and physically rested caregivers whose patience, love, and physical

endurance have been tested beyond any reasonable limit.[4]

104.     The County did not deny the Cohens access to mileage reimbursement.  The support

coordinators informed Jayson Cohen that he is eligible for reimbursements and the forms for

reimbursement are on the payment agent website.  Inexplicably, he did not seek it.

105.     The County did not deny the Cohens access to music therapy, which is covered under

Ms. Cohen's insurance plan.  Any request to allow services covered by insurance into the Waiver

would constitute a substantial change to the Waiver, which is not a reasonable accommodation.

---

[4]     Based on her severe functional limitations, Ms. Cohen is unable to testify and articulate
her pain, suffering, and loss of enjoyment of life resulting from the County's denial of benefits.
Other evidence, especially testimony by Jayson Cohen and Dr. Naser, establish by a
preponderance of evidence that Ms. Cohen's limitations continued to persist, and sometimes
escalate, during the period of the denial, and that maximum Waiver benefits were not received
throughout the contested period.  N.T. 4/8/21 at 56-59, 101-04, 106.

<u>Alexander</u>, 469 U.S. at 300.  Unlike the speech therapy denial, the County did not obstruct the facilitation of music therapy by pressuring the Cohens to seek services from a provider for which Ms. Cohen was not qualified.  <u>Supra</u> at ¶¶ 55-57, 62.  Rather, the County identified music therapy providers under the Waiver to the Cohens.  <u>Supra</u> at ¶¶ 74-75, 77.

      An appropriate Order accompanies this Opinion.